82 N.J. Super. 159 (1964)
197 A.2d 25
INDEPENDENT OIL WORKERS AT PAULSBORO, NEW JERSEY, PLAINTIFF,
v.
SOCONY MOBIL OIL COMPANY, INC., DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided January 17, 1964.
*162 Mr. Howard G. Kulp, Jr., for plaintiff (Messrs. Brown, Connery, Kulp & Wille, attorneys).
Mr. F. Morse Archer, Jr., for defendant (Messrs. Archer, Greiner, Hunter & Read, attorneys).
WICK, J.S.C.
This is a civil action wherein a union seeks to enjoin a company from carrying out or continuing in operation certain alleged new work rules and adjusted compensation procedures unilaterally instituted and inaugurated by the defendant company on December 2, 1963 and, further, the union seeks to enjoin the company from modifying the terms and conditions of their collective bargaining agreement without the mutual consent of the union.
Plaintiff Independent Oil Workers at Paulsboro, New Jersey, hereinafter referred to as the union, is an incorporated labor organization with its office located in Gloucester County, New Jersey. Defendant Socony Mobil Oil Company, Inc., hereinafter referred to as Socony, is a corporation duly organized and existing under the laws of the State of New York. It is engaged in the business of purchasing, refining and selling petroleum and other products, with one of its many refineries being located in Paulsboro, New Jersey.
The complaint, filed December 14, 1963, makes the following allegations, inter alia: On or about March 17, 1945 the union was duly certified by the National Labor Relations Board as the sole and exclusive bargaining representative for all non-supervisory production and maintenance employees, employed by Socony at its Paulsboro refinery, totalling upwards of 2,000 employees. On April 13, 1960 the union and Socony entered into a collective bargaining agreement which *163 by the terms thereof became effective on April 13, 1960 and extended to April 13, 1962. By amendatory agreements the term thereof was extended in full force and effect to March 1, 1964. The said collective bargaining agreement, admitted in evidence as a joint exhibit, provides, inter alia:

"RECOGNITION
The Company hereby recognizes the Union as the sole and exclusive Bargaining Representative with respect to rates of pay, wages, hours of employment, and other conditions of employment * * *

ARTICLE I
Adjustment of Wage Rates

* * * * * * * *
13. There will be no adjustment of wage rates for employees eligible to representation by the Union during the life of this Agreement, unless mutually agreed to by both the Company and the Union.

* * * * * * * *

ARTICLE XV

Joint Conference
1. The Company will meet with the Union not more often than two (2) afternoons per month for the consideration of questions of general importance concerning rates of pay, wages, hours of employment, and other conditions of employment.

* * * * * * * *
3. Either the Company or the Union may call a meeting of the joint conference, which shall be held within one (1) week of the date such request is served upon the other party, unless postponed by mutual agreement. Such notice shall be served on the Company by delivery to the Manager, or in his absence his authorized representative, and shall be served on the Union by delivery to the Chairman of Representatives or in his absence to the Deputy Chairman. Each notice and request shall state the question or questions to be considered at the meeting.

* * * * * * * *
5. The joint conference shall endeavor to agree upon questions at issue and shall avoid delay in the investigation, consideration and adjustment of these matters.

* * * * * * * *

ARTICLE XVIII

Term of Agreement
This Agreement may be modified at any time during its life by mutual consent of the Company and the Union."
It is alleged that for upwards of 20 years prior to December 2, 1963 it was the uninterrupted established practice and condition of employment for maintenance employees of *164 Socony, whose number at the time of the complaint approximated 700, to change from their street clothing into work clothing in the "change house" located within the refinery, preparatory to walking or otherwise traveling to their pre-assigned work sites, and to wait in the said "change house" until the plant whistle would blow signaling the 8 A.M. commencement of their daily work shift schedule (as agreed to under the collective bargaining agreement), whereupon the maintenance employees would then leave the "change house" to travel to and report at their respective job sites. At five minutes prior to the 4:30 P.M. termination of their respective daily work shift schedule, the plant whistle would again blow, signaling the time at which the maintenance employees were authorized and expected to leave their respective work sites and to return to the said "change house" for the purpose of again changing their clothing.
The period of time necessary to travel to and from the "change house" from and to the maintenance employees' respective work sites  would consume anywhere from 5 to 15 minutes' travel time each way, dependent upon the distance each employee would be required to travel to reach his work site destination.
Those employees whose work sites were more than five minutes walking or traveling distance from the "change house" were permitted and authorized to leave their respective work sufficiently in advance of the normal 4:25 P.M. plant whistle to enable them to return to and arrive at the "change house" immediately prior to the 4:30 P.M. termination of their respective daily work shift schedule.
During the entire uninterrupted period this established practice and condition of employment was in effect, the represented maintenance employees were compensated at their respective wage rates of pay for the entire daily work shift period, commencing from the time the plant whistle blew at 8 A.M., and their departure from the "change house" to travel to their respective job sites, until their return to the "change house" at 4:30 P.M. (except for their respective intervening *165 meal periods of one half hour), without any deduction being made therefrom for the described travel time.
It is alleged that notwithstanding the foregoing uninterrupted established practice and working condition, on or about October 24, 1963 defendant Socony, acting through one Agnes, the supervisor of Socony's maintenance department, notified Messrs. Black and Leone, respectively president and chairman of representatives of the union, that Socony had decided to institute and to continue indefinitely in the future a new work rule and adjusted compensation procedure applicable to the maintenance personnel represented by the union.
After one postponement Socony notified the union on October 31, 1963 that the new work rules and time recording procedures would be placed into effect. Socony imposed the new rules and procedures upon the maintenance employees on December 2, 1963. They are alleged to be of the following nature:
1. Each maintenance employee would be directed and required to leave the "change house" sufficiently in advance so as to be at his respective preassigned work site at or prior to the time the 8 A.M. plant whistle signal would blow.
2. Each maintenance employee would be directed and required to remain at his respective work site until the customary 4:25 P.M. plant whistle signal would blow (except for the established lunch periods), whereupon it would become the duty of each employee to locate his respective foreman and to deliver to him a certain card which would theretofore be delivered to each employee by Socony, for appropriate notations and entries to be made thereon, and only after location of and delivery to the foreman of the time card would each employee be authorized to return to the "change house."
3. Instead of being compensated from the time each employee left the "change house" at 8 A.M., as theretofore had been the practice, each employee would be compensated from the time commencing when he physically reported to his respective work site, at 8 A.M.
*166 The union avers that at no time did it acquiesce in or consent to the discontinuance of the established practice and condition of employment, or in the unilateral modification thereof by Socony, but on the contrary has offered to enter into good faith negotiations with Socony and Socony has persistently refused to so act. It is further alleged that said acts by Socony amount to a modification of the collective bargaining agreement and a readjustment of wage rates in violation of the terms of the collective bargaining agreement and the law.
Socony admits that it did not furnish any governmental agency with notice of its intended changes, as contended by the union.
The union contends that the acts alleged above will cause it immediate, substantial and irreparable loss and damage in that they have and will continue: to expose its membership to a substantial reduction in their normal rates of pay and earnings, which will necessitate the presentation and costly prosecution of a multiplicity of employee grievances by reason thereof; to deprive the union of valuable and substantial property rights and other benefits which it receives under the collective bargaining agreement; to expose the union to the loss or threatened loss of its membership and the resultant loss in the collection of dues; to expose the union to unwarranted embarrassment and loss of prestige; and to impair and damage the integrity of the collective bargaining agreement.
The union's final allegations are that the amount of damages which it has and will continue to sustain, if not accorded injunctive relief, cannot be fully and accurately determined; therefore the union has no adequate remedy at law, and further, greater injury will be inflicted upon the union by the denial of relief than would be inflicted upon Socony by the granting thereof.
An affidavit by Black and Leone accompanied the complaint and supported the allegations made therein. An order to show cause was signed by this court and made returnable *167 on December 20, 1963. Subsequently, it was mutually continued and adjourned to January 3, 1964.
An answer was filed with the court on January 3, 1964 which in substance denied that Socony's action amounts to a modification or breach of the collective bargaining agreement. It also added to and expanded upon the factual allegations in the complaint, to wit: On or about September 26, 1963 Socony advised the union that it was contemplating the installation of a time recording procedure, to become effective on October 14, 1963, and on the same date explained the details thereof. Socony further informed the union that for the two-week period from September 30, 1963 to October 11, 1963 it would hold meetings with groups of maintenance employees to familiarize them with the new procedure. These meetings were commenced as scheduled, the maintenance employees being invited to attend.
Between September 30, 1963 and October 7, 1963 the union requested a joint conference with Socony as provided in article XV of the collective bargaining agreement, in order to discuss the changes planned by Socony. This meeting was held on October 7, 1963. Sometime between October 7 and October 14 Socony advised the union that it was postponing the installation of the planned changes and would meet further with the union to continue discussion thereon. Meetings were held on October 17, 24, 31 and November 29, 1963, at which times discussion on the planned changes was continued. At the end of the meeting of November 29, 1963 Socony informed the union that the intended changes would be placed into effect on December 2, 1963, which was in fact done.
All of the above facts, as culled from the defendant's answer, were supported by oral testimony given at the hearing, to be subsequently discussed.
Defendant's contentions as presented in its list of separate defenses are as follows:
1. The complaint fails to state a claim upon which relief can be granted.
*168 2. The court lacks jurisdiction over the subject matter.
3. The court lacks jurisdiction because the alleged violations of the Labor Management Relations Act of 1947, as amended, fall within the exclusive jurisdiction of the National Labor Relations Board.
4. By virtue of N.J.S. 2A:15-51 et seq., the court is without the power to issue the remedy sought in this action.
5. The court should decline to hear the cause for the reason that the parties have agreed to settle disputes between them by discussion and, in certain disputes, to submit them to arbitration when necessary, as evidenced by the collective bargaining agreement.
A hearing on the union's request for a temporary injunction pending final hearing was conducted by this court on January 3, 1964. The only witness to testify was Frank P. Leone, an electrician (first class) employed by Socony and chairman of representatives for the union.
On direct examination the witness's testimony was for the most part in reasonable accord with the factual allegations made in the complaint. The court considered the following testimony as significant: In the early part of October 1963 Leone was personally instructed to report to the employees relations manager of the company. He was there orally informed of Socony's intention to put into effect a new "time keeping procedure." Upon inquiry Leone was informed at this meeting that the intended changes were considered by the defendant not to be in an area of negotiation; rather, they were part of management's prerogative. Socony maintained this position at all subsequent meetings, notwithstanding repeated requests by the union to negotiate. Socony willingly "discussed" its intended changes, but persistently refused to discuss the question whether the right existed to make the changes without the mutual consent of the union.
The witness attempted to make the impression on direct examination that the maintenance employees had voluntarily and somewhat spontaneously demonstrated in front of the building in which the October 7, 1963 meeting was held. *169 Upon cross-examination it was shown that the demonstration was anything but spontaneous. It took place as the proximate result of a letter sent to the maintenance employees "requesting" them to assemble in front of the building at 4:30 P.M., which was 2 1/2 hours after the start of the meeting. A copy of this letter has been placed into evidence.
The monetary obligation of the union members amounts to a yearly contribution of $24, payable at the rate of $2 per month.
When questioned about the reaction of the members of the union as a result of the changes in Socony's procedures, Leone stated:
"* * * they seem to be under the impression that they are paying this money for no good purpose; that if the company can do * * * anything that they want to, if they want to violate the contract, they can, they [the union members] don't understand why they should actually belong to our union * * *"
He further testified that
"* * * from the point of view of me as a chairman, and the rest of the officers of the union, it makes us look like we are practically nothing, because we don't have anything to actually give to our employees under this basis."
When asked if the union has been threatened with the loss of membership as a result of the changes instituted by Socony, Leone answered:
"Yes, I don't have no doubt, because, they have approached me, and I think whatever the future holds for us will govern that, because they seem to feel that if this can be done there's no reason for even having the Independent Oil Workers."
With regard to the new time-card reporting system, a time card, a copy of which has been placed in evidence, is to be picked up at the job site at 8 A.M. While in the employee's possession, it is his duty to record thereon the exact amount *170 of time spent on a particular job, as well as the type of work performed. The witness stated that in the past this task had been performed by supervision at a foreman's rate of pay.
The time card is to be returned to the foreman at 4:25 P.M., after which the employee would proceed to the locker room. The witness testified that if an employee was unable to locate the foreman, he would be obligated to continue to search for him after 4:30 P.M. and would receive no extra compensation therefor. However, it was brought out in cross examination that at no time had a maintenance employee been unable to locate a foreman at 4:25 P.M., or someone acting in his stead.
Although it was alleged in the complaint that there are approximately 700 maintenance employees, Leone indicated at the hearing that it would be "anywhere from 565 to 600 and some." Out of this group approximately 75 to 100 work in the various refinery shops, 100 work in what is called resident maintenance because they have a working position or station, and "under 20" work in the storehouse. All of the afore-mentioned employees are regularly assigned to go to the same work sites every day unless, of course, there is a change in scheduling.
The witness was asked upon cross examination whether the balance of the maintenance crew totalling approximately 380 employees did in fact wait in the "change house" for the 8 A.M. commencement of work whistle. The initial responses to this question were vacillating and evasive, the witness finally stating that "The biggest majority did" or "three quarters of them" did remain in the "change house" until the 8 A.M. whistle.
Under the new procedures, the maintenance personnel who are alleged to have previously waited in the "change house" until the 8 A.M. whistle, must now report to one of six assignment areas in the refinery at 8 A.M. Each of the assignment areas is at a fixed location and at a measurable and known distance from the "change house." If it should be necessary for the employee to walk or travel to a third location *171 within the refinery, this second period of "walking time" is after 8 A.M. and compensable.
The maintenance employees are able to determine which assignment area to report to the following day by reading a notice posted in the late afternoon, but before 4:30 P.M., on a bulletin board located outside the "change house." The witness indicated that he understood this to be the practice but did not himself adhere thereto. Rather, he read the bulletin board in the morning because he worked in a standard area.
On December 26, 1963 an oral grievance was filed by the union which alleged that use of the time-card procedure was a breach of the recognition clause and method of payment clause of the collective bargaining agreement, and in addition to and apart from the four corners of the bargaining contract, the new procedure amounts to a change of a long-established practice. The oral grievance was followed up by a written grievance filed on or about December 31, 1963.
Upon completing examination of Leone, counsel stipulated that an additional witness, Black, president of the plaintiff union, if called, would testify as to the various meetings held with management in a manner which would be exactly the same as the testimony of Leone in reference thereto.
At the conclusion of the hearing counsel for defendant Socony made two oral motions: (1) to stay any further court action in this controversy pending submission of the dispute to arbitration pursuant to N.J.S. 2A:24-4, and (2) that the court make a finding that this dispute involves a "labor dispute" within the meaning of the Anti-Injunction Act, N.J.S. 2A:15-53.
Initially, let it be stated without reservation that this court is of the opinion it has the jurisdiction required to hear and determine the controversy sub judice even though it may constitute what amounts to an unfair labor practice cognizable before the National Labor Relations Board. Donnelly v. United Fruit Co., 40 N.J. 61 (1963); Carpenters & Millwrights Local Union No. 2018, United Brotherhood of Carpenters & Joiners of America, A.F.L.-C.I.O. v. Riggs-Distler *172 & Co., 40 N.J. 97 (1963); Cosmark v. Struthers Wells Corp., 412 Pa. 211, 194 A.2d 325 (Sup. Ct. 1963); Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); Dowd Box Co. v. Courtney, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962); Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); Atkinson v. Sinclair Refining Company, 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); National Labor Relations Act as amended § 8(a) (5) and (d), 61 Stat. 140, 29 U.S.C. §§ 185(a) and 158(a)(5) and (d) (1947).
In considering the plea of the union for a temporary injunction pending final hearing, whether an injunction will issue is dependent upon compliance with the strict provisions of the New Jersey Anti-Injunction Act, N.J.S. 2A:15-51 et seq. In order to issue a temporary injunction in a dispute involving or growing out of a labor dispute, the court must hear the testimony of witnesses in open court (with the opportunity for cross-examination) in support of the allegations of a verified complaint, as well as testimony in opposition thereto, if offered. N.J.S. 2A:15-52.
The Anti-Injunction Act defines a labor dispute in very broad terms, to wit:
"The term `labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, or concerning employment relations, or any other controversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand in the proximate relation of employer and employee." N.J.S. 2A:15-58(c).
It is readily apparent that the Legislature intended to encompass the widest possible range of cases within its provisions. The facts in the instant dispute clearly bring it within the definition of labor dispute in that the dispute involves "terms and conditions of employment," namely, time worked and a *173 change in historic practice of the company with reference to the new time-card procedure.
The fact that a breach of a labor contract is alleged does not withdraw this controversy from the scope of the Anti-Injunction Act. In the case of Commercial Can Corp. v. Local 810, etc., Teamsters, 61 N.J. Super. 369 (App. Div. 1960), the court held that the Anti-Injunction Act prohibits the granting of an injunction for the breach of an explicit clause in a labor contract in disregard of the requirements of the act. The court there stated:
"* * * since there is nothing in our Anti-Injunction Act * * * to warrant excluding from its protections those labor disputes in which one of the disputants has also breached the bargaining contract, the conclusion necessarily follows that where a labor dispute is involved, even in a breach of contract situation, the exercise of our state equity jurisdiction must conform with the procedures of the act." (61 N.J. Super., at p. 382)
Defendant has charged that plaintiff has failed to make every reasonable effort to settle their dispute, and therefore has not fulfilled the obligation imposed upon it by N.J.S. 2A:15-54, requiring that:
"No * * * injunctive relief may be granted to any plaintiff who has failed * * * to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."
A review of the testimony reveals that plaintiff's representatives have sought, on repeated occasions, the opportunity of engaging in collective bargaining negotiations with defendant with respect to the procedures placed into effect on December 2, 1963. The record stands uncontroverted that at the various meetings conducted by the parties hereto, Socony willingly consented to "explain" the new procedures but steadfastly refused to "negotiate" thereon. Obviously, if Socony refused to afford the union an opportunity to negotiate, then no negotiations could ensue. The union, through its representatives has made a reasonable effort to attempt to settle the dispute by one of the methods outlined in N.J.S. 2A:15-54. *174 No more is required. Kidde Mfg. Co. v. United Elec. etc., of America, 27 N.J. Super. 183 (Ch. Div. 1953); Phelps Dodge Copper Products Corp. v. United Elec. & Mach. Workers of America, 138 N.J. Eq. 3 (Ch. 1946), affirmed Westinghouse Elec. Corp. v. United Elec. Radio, etc., of America, 139 N.J. Eq. 97 (E. & A. 1946); Westinghouse Elec. Corp. v. United Elec. Radio & Mach. Workers of America, 138 N.J. Eq. 44 (Ch. 1946); Isolantite, Inc. v. United Elec. Radio & Mach. Workers of America, 130 N.J. Eq. 506 (Ch. 1941), modified on other grounds 132 N.J. Eq. 613 (E. & A. 1942).
In addition to the foregoing, the court must make four specific findings of fact before a temporary injunction may issue. They are:
"a. That unlawful acts have been committed and are likely to be continued unless restrained;
b. That substantial and irreparable injury to plaintiff's property will follow unless the relief is granted;
c. That as to each item of relief granted greater injury will be inflicted upon plaintiff by the denial thereof than will be inflicted upon defendants by the granting thereof;
d. That plaintiff has no adequate remedy at law." N.J.S. 2A:15-53.
Attention is directed first to the requirement of subsection (a). As a general rule, an employer cannot lawfully change the wages, hours and conditions of employment of his organized workers without negotiations with the union, and this is true even though the employer is acting in good faith. N.L.R.B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); McLeod for and on Behalf of N.L.R.B. v. Compressed Air, etc. Workers, Local No. 147, 292 F.2d 358 (2 Cir. 1961); National Labor Relations Act as amended § 8(a)(5) and (d), 61 Stat. 140, 29 U.S.C. §§ 158(a)(5) and (d) (1947); cf. N.L.R.B. v. Jacobs Mfgr. Co., 196 F.2d 680 (2 Cir. 1952). Also, it is an unfair practice for an employer to refuse to negotiate on disputed points of an existing contract. Alexander Mulburn Co., 62 N.L.R.B. 482 (1945).
*175 As previously noted, the instant collective bargaining agreement "may be modified at any time during its life by mutual consent of the Company and the Union." (Emphasis added) It would seem, therefore, that any proposed mid-term contract modification requires mutual negotiations as the antecedent to the essential "mutual consent."
The testimony of the union representative was not as clear in some of its particulars as one might have desired it to be. However, it was sufficiently uncontradicted for this court to find without the least bit of reluctance or hesitation that Socony has unilaterally placed into effect a set of new work rules and procedures without giving proper notice thereof to the union, and thus having failed to fulfill its obligation under the collective bargaining agreement and federal law, has committed "unlawful acts," as required to be found under N.J.S. 2A:15-53(a).
It should be noted and emphasized that the court's decision with regard to its finding of "unlawful acts" is narrowly limited to the union's request for interim relief pending final hearing. The present conclusion will not detract from the opportunity of both parties to submit all available proof at final hearing in support of their respective positions.
Skipping over subsections (b) and (c) for a moment, the court finds that the union has no adequate remedy at law. Damages to the union cannot be measured prospectively with any degree of accuracy. "The [labor] contract confers rights and benefits upon both parties that cannot be clearly ascertained or measured in damages." Mountain States Division No. 17, Communications Workers of America v. Mountain States Tel. & Tel. Co., 81 F. Supp. 397 (D. Colo. 1948). Loss of prestige and membership of a union, assuming it is adequately shown to exist, is incalculable in terms of its future effect.
Subsections (b) and (c) are considered together. The term "property," as it is used in subsection (b) in conjunction with "substantial and irreparable injury" is not confined solely to tangible property, but embraces any subject of *176 Chancery protection, including business, calling or profession. Phelps Dodge Copper Products Corp. v. United Elec. Radio & Mach. Workers of America, supra. Therefore, adequate proof by a union of loss of prestige and/or threatened loss of membership and the collection of dues, would be a sufficient showing of irreparable harm. In the instant proceedings the testimony of the union representative merely indicates that there has been some general dissatisfaction expressed within the union rank and file. It has not been established that this dissatisfaction will transform itself into specific injury to plaintiff. The testimony in this regard consists, at most, of the witness's personal speculations. Such testimony can hardly be the basis for the finding of fact required by the Anti-Injunction Act.
Plaintiff has failed to sufficiently show the facts which would lead to the conclusion that irreparable loss or harm will result to the union. For this reason the union's request for a temporary injunction is denied.
Defendant Socony has moved that the judicial proceedings in this dispute be stayed pending submission of the controversy to arbitration as outlined in the collective bargaining agreement. This motion was based on N.J.S. 2A:24-4, which provides:
"In an action brought in any court upon an issue arising out of an agreement providing for the arbitration thereof, the court, upon being satisfied that the issue involved is referable to arbitration, shall stay the action, if the applicant for the stay is not in default in proceeding with the arbitration, until an arbitration has been had in accordance with the terms of the agreement."
As noted in defendant's brief, this statute has been held to be applicable to an agreement to arbitrate a labor dispute. International Ass'n of Machinists, Lodge 1292, Ind. v. Bergen Ave., etc., Ass'n, 3 N.J. Super. 558 (Law Div. 1949).
The judicial attitude toward arbitration has changed from disfavor, Vynior's case, 8 Coke Rep. 81 (K.B. 1609); Anderson v. Odd Fellows Hall, 86 N.J.L. 271 (E. & A. 1914), to being highly favored as a method of settling disputes, *177 Donnelly v. United Fruit Co., supra; Shribman v. Miller, 60 N.J. Super. 182 (Ch. Div. 1960); Federal Labor Union 23393, American Federation of Labor v. American Can Co., 28 N.J. Super. 306 (App. Div. 1953); Collingswood Hosiery Mills v. American Fed. Hosiery Wkrs., 28 N.J. Super. 605 (Ch. Div. 1953), both as to legal and factual issues. Milk Drivers & Dairy Employees, Local 680 v. Cream-O-Land Dairy, 39 N.J. Super. 163 (App. Div. 1956).
Where the collective bargaining agreement requires arbitration before resort to the courts, failure to comply therewith warrants dismissal of the action. Shribman v. Miller, supra. In the situation where arbitration is not set forth as a condition precedent, the court may grant a stay to permit arbitration under N.J.S. 2A:24-4 where, and only where, the employer and union have expressly agreed to submission. Federal Labor Union 23393, American Federation of Labor v. American Can Co., supra. The rule was aptly set forth in the case of Machine Printers Beneficial Ass'n of United States v. Merrill Textile Print Works, Inc., 12 N.J. Super. 26, 31 (App. Div. 1951):
"Although settlement of a controversy by arbitration is favored by the courts, `A submission to arbitration is essentially a contract. * * * The authority of the arbitrators is derived from the mutual assent of the parties to the terms of submission; the parties are bound only to the extent, and in the manner, and under the circumstances pointed out in their agreement, * * *. They have a right to stand upon the precise terms of their contract.'"
Collingswood Hosiery Mills v. American Fed. Hosiery Workers, supra.
Upon a careful analysis of the collective bargaining agreement, it does not appear that arbitration was intended as a condition precedent to resort to the courts. Neither does the court have the power or right to stay these proceedings pending submission of the dispute to arbitration. The right to seek injunctive relief has been specifically and expressly reserved by the parties as a cumulative or additional remedy, not dependent upon prior arbitration. The foregoing is expressed *178 in the following portion of the collective bargaining agreement:
"Nothing in this Agreement shall prevent either Company or Union * * * from applying * * * to a court of competent jurisdiction for the relief to which such party may be entitled * * * including, but not limited to, * * * injunction against present or prospective violation of such agreement, * * *." (Emphasis added)
The intent of the parties as expressed in their contract must prevail. Accordingly the motion for a stay is denied.